## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

MICHAEL TEREL JONES,

                                        :

        Plaintiff,                        Case No. 3:04-cv-373

                                        :        District Judge Walter Herbert Rice
      -vs-                         Chief Magistrate Judge Michael R. Merz

GENERAL MOTORS CORPORATION, :
  et al.,

           Defendants.           :

===

## REPORT AND RECOMMENDATIONS

===

        This case is before the Court on Motions for Summary Judgment of Defendants IUE-CWA Local 798 ("Local 798")(Doc. No. 63) and General Motors Corporation ("GM")(Doc. No. 66). Plaintiff has opposed both Motions (Doc. Nos. 68-72) and GM has filed a Reply Memorandum (Doc. No. 73).

        Although Plaintiff has opposed both Motions with lengthy factual narratives, he has presented no admissible evidence in support of his positions. There is no sworn testimony by Mr. Jones or any other person, despite the Court's having advised him (Doc. No. 65) of the quality of evidence which must be submitted to avoid summary judgment. For example, Mr. Jones cites to what is apparently his own diary for a number of facts, but none of this material is sworn to, nor does it show Mr. Jones would be competent to testify to the matters asserted.

        Moreover, none of the documents submitted with the Memoranda in Opposition have been properly certified so that they could be admissible. Rule 56 requires that documents submitted in support of or opposition to a motion for summary judgment be authenticated, but none of these

1

documents is so authenticated.

Finally, the documentation often fails to prove the points for which it is cited. For example, Mr. Jones claims that all required paperwork was sent to the National Benefits Center by his doctors (Doc. No. 67 at 5), citing Exhibit 10. The referenced exhibit, however, purports to be a letter from a Suzanne Burnett at the Consolidated Income Security Administration in Southfield, Michigan, to the Ohio Department of Job and Family Services which, if it were admissible, would support Defendants' position in that it states that Plaintiff voluntarily quit when he failed to report for work after his sick leave expired; it says nothing about any doctor's reports.

All of the Court's rulings in this Report are in part based upon the fact that Defendants have submitted admissible evidence and Plaintiff has not.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but

rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law.  Fed. R. Civ. P. 50).  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).  If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate.  *Id*.  The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S. Ct. at 2510-11 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F. 2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F. 2d 859, 863 (6th Cir. 1986)). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis.  *Hartsel v. Keys*, 87 F. 3d 795 (6th Cir. 1996).  "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S. Ct. at 2510.

The moving party

3

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323;  *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted).  If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F. 2d 606, (6th Cir. 1992), *cert. denied*, 506 U.S. 1054, 113 S. Ct. 979, 122 L.Ed.2d 133 (1993).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990).  Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

A fact is "material" if its resolution affects the outcome of the lawsuit.  *Lenning v. Commercial Union Ins. Co.,* 260 F.3f 574, 581 (6th Cir. 2001).  "Materiality is determined by the substantive law claim." *Boyd v. Baeppler,* 215 F.3d 594, 599 (6th Cir. 2000).  An issue is genuine if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.,* 14 F.3d 1143, 1148 (6th Cir. 1994), quoting *Anderson,* 477 U.S. at 248.  Irrelevant or unnecessary factual disputes do not create genuine issues of material fact.  *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 943 (6th Cir. 2000).  When the "record taken as a whole could

not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Simmons-Harris v. Zelman,* 234 F.3d 945, 951 (6th Cir. 2000), *rev'd on other grounds,* 536 U.S. 639 (2002). Thus, a factual dispute which is merely colorable or is not significantly probative will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.), *cert. denied* 510 U.S. 976 (1993); *see also, Int'l Union United Auto., Aerospace & Agriculture Implement Workers of America v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir. 1999), *cert. denied* 529 U.S. 1076 (2000).

The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street,* 886 F.2d at 1479. A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252. If, after sufficient opportunity for discovery, the non-moving party is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.,* 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enterprises v. Elvisly Yours, Inc.,* 936 F.2d 889, 895 (6th Cir. 1991).

The Court may grant summary judgment on the issue of causation when warranted. *Bailey v. Floyd County Bd. or Education.,* 106 F.3d 135, 145 (6th Cir, 1997). For example, reliance solely on the fact that an adverse employment decision occurred after the alleged protected conduct is insufficient. *Id.* at 144-45. "A mere scintilla of evidence is [likewise] insufficient" to create a genuine issue of material fact. *Landham v. Lewis Galoob Toys, Inc.,* 277 F.3d 619, 622 (6th Cir. 2000).

The facts set forth in this Report are admitted or established by evidence competent under Fed. R. Civ. P. 56(e) and not controverted by opposing competent evidence.

## Analysis

The Complaint in this case (Doc. No. 2), which was filed by Plaintiff *pro se*, purports to state nine claims for relief: (1) libel, (2) slander, (3) breach of contract, (4) intentional infliction of emotional distress, (5) violation of the right to privacy, (6) civil conspiracy, (7) discrimination/ retaliation for filing a claim with the EEOC, (8) tortious interference with a beneficial relationship, and (9) wrongful discharge.  Earlier in the case, Local 798 moved to dismiss the seventh, eighth, and ninth causes of action and that Motion was granted (Decision and Entry, Doc. No. 31).  Plaintiff has now withdrawn his claim for tortious interference with a beneficial relationship insofar as it remained against GM (Response in Opposition, Doc. No. 69, at 32).  Thus the first six claims for relief remain pending against Local 798 and eight claims remain pending against GM.   All remaining claims against these Defendants are the subject of the Motions *sub judice*.

Plaintiff's seventh claim for relief (discrimination/retaliation) appears to arise under Title VII of the 1964 Civil Rights Act and thus to be a claim over which this Court has subject matter jurisdiction under 28 U.S.C. §1343.  As will be discussed below, the breach of contract claim (third claim for relief) appears to arise under 29 U.S.C. §185 and therefore to be within federal court jurisdiction under 28 U.S.C. §1331.  Because there is not complete diversity of citizenship between the parties, the Court's jurisdiction over the remaining claims derives from 28 U.S.C. §1367.

With respect to any claims arising under state law, state substantive law provides the rules of decision.  28 U.S.C. §1652; *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 2d 1188 (1938).  In applying state law, the Sixth Circuit follows the law of the State as announced

by that State's supreme court. *Ray Industries, Inc. v. Liberty Mut. Ins. Co.*, 974 F. 2d  754, 758 (6th Cir. 1992); *Miles v. Kohli & Kaliher Assocs.,* 917 F. 2d 235, 241 (6th Cir. 1990). "Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." *Id.; In re Akron-Cleveland Auto Rental, Inc.,* 921 F. 2d 659, 662 (6th Cir. 1990); *Bailey v. V & O Press Co.*, 770 F. 2d 601 (6th Cir. 1985); *Angelotta v. American Broadcasting Corp.,* 820 F. 2d 806 (1987).  The available data to be considered if the highest court has not spoken include relevant dicta from the state supreme court, decisional law of appellate courts,  restatements of law, law review commentaries, and the "majority rule" among other States. *Bailey*, 770 F. 2d at 604. "Where a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on  point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir.1989); *accord Northland Ins. Co. v. Guardsman Products, Inc*., 141 F.3d 612, 617 (6th Cir.1998). This rule applies regardless of whether the appellate court decision is published or unpublished. *See Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 328 (6th Cir.2000); *Puckett,* 889 F.2d at 1485.  *Ziegler v. IBP Hog Market*, 249 F.3d 509, 517 (6th Cir. 2001). Of course, the Federal Rules of Civil Procedure govern regardless of the basis of jurisdiction. *Sibbach v. Wilson*, 312 U.S. 1, 61 S. Ct. 422, 85 L. Ed. 479 (1940).

1.      **Plaintiff's Claims for Libel, Slander, and Invasion of Privacy are Barred by the Statute of Limitations.**

On or about August 18, 2003,Mr. Jones was sent to an Independent Medical Examiner, Dr. Mark Reynolds, for an evaluation. Dr. Reynolds' notes state that Mr. Jones reported "passive suicidal thoughts . . . . But has no plan or intent." Exh 83 to Jones Dep. He also recorded in his notes that Mr. Jones stated "He further planned once to use his military training to deal with the people

at General Motors whom he feels have wronged him. He reports however he is a Jehovah's Witness and feels very guilty about these thoughts and would not act on them." Exh. 83 to Jones Dep. Dr. Reynolds' notes in Mr. Jones' benefits file noted "passive suicidal and homicidal ideation without plan or intent." Exh. 37 to Jones Dep.

In August, 2003, GM's National Benefits Center notified the Company Medical Department. Labor Relations was notified that Mr. Jones should not be routinely admitted to the plant. Krey Dec ¶ 3. Labor Relations instructed security that Mr. Jones should not be admitted to the plant until Labor Relations was notified and approved. Krey Dec. ¶ 4. Labor Relations did not provide a reason for this instruction. Krey Dec. ¶ 4. Mr. Jones believes that the picture of him sent to the guard shack was also distributed in the plant and that this caused his co-workers, and eventually, members of his church, to question whether he was violent. Compl. ¶ ¶ 69-70. On or about August 26, 2003, Mr. Jones sought admission to the plant. The security guard informed him that she would need to call Labor Relations first. Mr. Jones, upon hearing this information, decided to leave without entering the plant. Exh. 60 to Jones Dep.

In his deposition, Plaintiff made clear that his complaints of libel, slander, and invasion of privacy are based on the fact that the information from Dr. Reynolds was transmitted to the plant with the result that he was denied entry in August, 2003, and Mr. Jones' belief that word of this action reached his co-workers and, eventually, members of his religious community. Jones Dep. 162:18-168:3. The alleged invasion of privacy, similarly, is that the "defendants gained access to personal information from the National Benefit Center Unauthorized and did share that information with unauthorized third parties and did out of pure malice and spite subject plaintiff to embarrassment, humiliation, loss of status and significant and lifelong loss and damage" Compl. ¶ 84.

In Ohio, the statute of limitations for an action for libel or slander is "one year after the cause of action accrued." Ohio Revised Code § 2305.11 (A). A cause of action for invasion of privacy does not have a specific statute of limitations. However, the Ohio Supreme Court has ruled that the statute of limitations is based on "the true nature or subject matter of the acts giving rise to the complaint, rather than the form in which the action is pleaded." *Hidey v. Ohio State Highway Patrol*, 116 Ohio App. 3d 744, 747 (1996), citing *Doe v. First United Methodist Church*, 68 Ohio St.3d 531, 536 (1994). Thus this alleged invasion of privacy, which consists of transmission of derogatory information, is governed by the statute of limitations for libel or slander, to wit, one year.

It is undisputed that the information from Dr. Reynolds was transmitted from the National Benefits Center and, ultimately, to plant security on or about August, 2003. Krey Dec. ¶ 4; Exh. 60 to Jones Dep. The incident where he was denied entry to the plant occurred in August, 2003. Mr. Jones filed his complaint on or about October 21, 2004. Thus these complaints are time-barred.

Even if the complaints were not time-barred, the complaint shows, on its face, that the communications complained of by GM were communications concerning Mr. Jones arising out of his employment status with GM. Such statements are subject to a qualified privilege. See *Evely v. Carlon Company, Div. of Indian Head*, 4 Ohio St. 3d 163, 165 (1983). This qualified privilege extends to an invasion of privacy claim based on intrusion into a plaintiff's private affairs. *Hamrick v. Wellman Products Group*, 2004 WL 2243168 (Ohio App. 2004) (holding that an employer investigating a claim of sexual harassment not liable for invasion of privacy because "There is a qualified privilege for statements concerning matters of common business interest.")

Plaintiff asserts the claims are not barred by the statute of limitations because the statute is tolled while an EEOC investigation is underway, but he cites no law for that proposition as it might apply to pendent state law claims and none is known to the Court.

Plaintiff also claims the benefit of equitable tolling under *Andrews v. Orr*, 851 F.2d 146 (6th Cir. 1988), in which the court "specifically identified five factors to consider when determining the appropriateness of equitably tolling a statute of limitations: (1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim. *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 561 (6th Cir. 2000)." *Dunlap, v. United States*, 250 F. 3d 1001 (6th Cir. 2001). This list of factors is not necessarily comprehensive, and not all factors are relevant in all cases. *Miller v. Collins*, 305 F. 3d 491 (6th Cir. 2002). "Absence of prejudice is to be considered only after a factor that might justify tolling is identified." *Allen v. Yukins*, 366 F. 3d 396 (6th Cir. 2004), *quoting Vroman v. Brigano*, 346 F. 3d 598, 605 (6th Cir. 2003). "[I]gnorance of the law alone is not sufficient to warrant equitable tolling." *Allen v. Yukins,* 366 F. 3d 396 (6th Cir. 2004), *quoting Rose v. Dole*, 945 F. 2d 1331, 1335 (6th Cir. 1991).

The burden is on the petitioner to demonstrate that he is entitled to equitable tolling. *Allen v. Yukins,* 366 F. 3d 396 (6th Cir. 2004); *McClendon v. Sherman,* 329 F. 3d 490, 494 (6th Cir. 2003); *Griffin v. Rogers,* 308 F. 3d 647, 653 (6th Cir. 2002). Typically, equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control. *Jurado v. Burt*, 337 F.3d 638 (6th Cir. 2003), citing *Graham Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 561 (6th Cir. 2000). "Absent compelling equitable considerations, a court should not extend limitations by even a single day." *Id.* at 561.

Finally, Plaintiff asserts that these three torts are a continuing action, but he cites no evidence to prove any repetition of the alleged slander within the statutory period. For example, he claims

10

"[a]s recently as February 2006 Theodore Daniels, basing his information on plant sources, refers to Mr. Jones as bipolar and crazy, a cruel and malicious statement directed against Mr. Jones." (Response in Opposition, Doc. No. 69, at 24.)  No evidentiary support is offered for this allegation. If anything, it is a slander by Mr. Theodore Daniels, not by any of the Defendants.

Plaintiff's First, Second, and Fifth Causes of Action, for libel, slander, and invasion of privacy respectively, should be dismissed as barred by the statute of limitations.


**2.      Plaintiff's Eighth Claim for Wrongful Discharge is Pre-Empted.**

Plaintiff  became a permanent employee of GM in 1994 with a seniority date of April 29, 1994.  His entire employment was governed by a collective bargaining agreement between GM and Local 798.

Plaintiff seems to concede that his employment relationship was governed by the collective bargaining agreement.  He does not assert any separate tort or contract basis for the wrongful discharge claim.  In any event, any such claim by a person governed by a collective bargaining agreement is pre-empted by 29 U.S.C. §185.  The Supreme Court has held that

> the pre-emptive force of §301 [of the LMRA] is so powerful as to displace entirely any state cause of action "for violation of contracts between an employer and a labor organization."  Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of §301.

*Franchise Tax Bd.  v.  Construction Laborers Vacation Trust,* 463 U.S. 1 (1983)(footnote omitted), *quoting,* 29 U.S.C. §185(a).  The broad preemptive force of §301 has been understood to extend to all contract claims based on an alleged breach of a collective bargaining agreement.  *See, Int'l Brotherhood of Electrical Workers v.  Hechler,* 481 U.S. 851 (1987).

11

In *Lingle v. Norge Division of Magic Chef, Inc.,* 486 U.S. 399 (1989), the Court stated the governing principle for §301 preemption cases:

> if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is preempted and federal labor-law principles—necessarily uniform throughout the nation—must be employed to resolve the dispute.

*Id.* at 405-406.

In *DeCoe v. General Motors Corp.,* 32 F.3d 212 (6th Cir. 1994), the Sixth Circuit detailed a two-step approach to deciding whether §301 preemption applies:

> First, the district court must examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms. Second, the court must ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law. If the right is born of state law and does not invoke contract interpretation, then there is no preemption. However, if neither or only one criterion is satisfied, section 301 preemption is warranted.

*Id.* at 216. Mr. Jones has not pled a state law tort claim relating to the discharge. To the extent he has pled or attempted to plead a state breach of contract claim, the claim is pre-empted by §301 of the National Labor Relations Act, 29 U.S.C. §185, because it clearly involves interpretation of the collective bargaining agreement.

**3.    Plaintiff has Insufficient Proof to Sustain his Fourth Claim for Intentional Infliction of Emotional Distress**

In recognizing the tort of intentional infliction of emotional distress in Ohio, the Ohio Supreme Court adopted Restatement of the Law 2d, Torts 2d, §46, and comment d to that section which reads:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict

emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. See Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harvard Law Review 1033, 1053 (1936).

*Yeager v. Local Union 20,* 6 Ohio St. 3d 369, 453 N.E. 2d 666 (1983).

In order to recover on an action for the intentional infliction of serious emotional distress four elements must be proved: 1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered utterly intolerable in a civilized community; 3) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and 4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable person can be expected to endure it. *Miller v. Currie,* 50 F. 3d 373 (6th Cir. 1995); *Pyle v. Pyle,* 11 Ohio App. 3d 31, 34, 463 N.E.2d 98, 103 (Cuyahoga Cty. 1983) (citation omitted); *Bellios v. Victor Balata Belting Co*., 724 F. Supp. 514, 520 (S.D. Ohio 1989).

In support of this claim, Plaintiff asserts:

Plaintiff was told by John Bowles as well as other members of

> management that he would be dealt with and was subjected to the
> most horrendous treatment during his employment at General Motors.
> It is a well-established fact that Mr. Jones would go out on sick leave
> constantly to deal with these adversities placed on him by
> management. Mr. Jones was constantly put under the most extreme
> pressure to perform driving his stress level as well as his blood
> pressure to fatal levels.  Even when the employer learned of this and
> sent Mr. Jones home, not permitting him to drive for fear of a stroke
> or heart attack, this treatment continued to the point that Mr. Jones
> could no longer work under the conditions General Motors had him
> under, thus his sick leave.

(Response in Opposition, Doc. No. 69, at 30-31.)

This response is totally insufficient to withstand a motion for summary judgment.  First of all, it is unsworn assertion by the Plaintiff, unsubstantiated by any reference to admissible evidence. For example, what doctor is prepared to testify about the asserted medical causation alleged here or the severity of the distress? Secondly, it is completely conclusory: what conduct was so "horrendous"? When did it happen? What was said or done by whom?

Plaintiff has failed to produce evidence from which a jury could find that he was subjected to intentional infliction of emotional distress by anyone at GM within the scope of employment. Plaintiff's fourth claim for relief should be dismissed with prejudice.

**4.     Plaintiff has Insufficient Proof to Sustain his Sixth Claim for Civil Conspiracy**

A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is agreement among the parties.  *Hampton v. Hanrahan,* 600 F. 2d 600, 620-21 (7th Cir. 1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S. Ct. 1987, 64 L. Ed. 2d 670 (1980). "Liability attaches for a civil conspiracy when a plaintiff can prove that two or more defendants agreed to injure another by unlawful action and committed an overt act in furtherance of the conspiracy." *Michigan Paytel*

*Joint Venture v. City of Detroit,* 287 F. 3d 527, 541 (6th Cir. 2002).

      In Ohio, a civil conspiracy consists of the following:  (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy.  *Universal Coach v. NYC Transit Authority,* 90 Ohio App. 3d 284, 629 N.E. 2d 28 (Cuyahoga Cty.,1993), citing *Minarik v. Nagy,* 8 Ohio App. 2d 194, 26 Ohio Op. 2d 359, 193 N.E. 2d 280 (1963).  The requirement of an independent unlawful act is confirmed in *Williams v. Aetna Fin. Co., infra.,* citing *Gosden v. Louis,* 116 Ohio App. 3d 195, 219, 687 N.E. 2d 481, 496 (1996).  A civil conspiracy under Ohio law consists of a "malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."  *Kenty v. Transamerica Premium Ins. Co*., 72 Ohio St. 3d 415, 419, 650 N.E. 2d 863 (1995), quoting *LeFort v. Century 21-Maitland Realty Co*., 32 Ohio St. 3d 121, 512 N.E. 2d 640 (1987) citing *Minarik, supra*.  Quoted with approval in *Williams v. Aetna Fin. Co.*, 83 Ohio St. 3d 464, 475 (1998).

      As proof that Defendants conspired against him, Plaintiff asserts:

> Tracy Merritt told Mr. Jones that both the Union and the Company agreed to get rid of him and that other idiot that works in the body shop.  (Jones Diary) It was quite evident when, Mr. Jones seeking to have his right enforced by the Union, was denied said rights and willfully and purposefully mislead [sic] by both the Union, and Management on his actual termination date, to deprive him of his collectively bargained grievance procedure, thus the claim of civil conspiracy must stand since it is related to defendants' actions against Mr. Jones.

(Response in Opposition, Doc. No. 69, at 35.)  What Tracy Merritt told Mr. Jones is inadmissible hearsay.  Further, we do not know from the context who Tracy Merritt is, how she formed this opinion, etc.  While it is Mr. Jones' opinion that he was denied his rights under the collective bargaining agreement, he has offered no proof GM and Local 798 conspired (agreed) to do that.  Obviously the actions of both GM in treating Mr. Jones as having quit and Local 798 in failing to

grieve that treatment successfully both had to happen for Mr. Jones to be in the position he is in today, but merely parallel action is insufficient to support an inference of conspiracy. The Sixth Claim for Relief should be dismissed with prejudice.

**5.  Plaintiff Cannot Prove a Breach of Contract by GM or Failure to Represent by Local 798.**

As noted above, Mr. Jones' employment with GM was always governed by a collective bargaining agreement. Mr. Jones asserts in his Third Claim for Relief that GM breached that agreement by treating him as having quit when he did not return from sick leave and that Local 798 breached its duty of fair representation in failing to grieve that treatment.

The Third Cause of Action arises under 29 U.S.C. §185, a so-called hybrid §301 action. Such an action "involves two constituent claims: breach of a collective bargaining agreement by the employer and breach of the duty of fair representation by the union." *Black v. Ryder/P.I.E.*, 15 F.3d 573, 583 (6th Cir. 1994). To succeed against GM, Plaintiff must prove it breached the collective bargaining agreement. To succeed against the Union, Mr. Jones must prove both a breach of the contract by GM and a failure by Local 798 to fairly represent him with respect to that breach. *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 164 (1983). So, "[u]nless a plaintiff 'demonstrates both violations, he cannot succeed against either party.'" *Garrison v. Cassens Transport Company*, 334 F.3d 528 (6th Cir. 2003) (*quoting Bagbsy v. Lewis Bros. Inc. of Tenn.*, 820 F.2d 799, 801 (6th Cir.1987)).

GM treated Mr. Jones as on approved sick leave on June 30, 2003, with an actual last-date-worked of June 26, 2003. From that date forward, Mr. Jones regularly submitted statements from his physician, Dr. Martin Schear, that he was unable to work; the last such statement indicated he could return to work as of March 30, 1994. Although his sick leave was extended by GM to May

17, 1994, he never actually returned to work. A month later GM exercised its rights under the collective bargaining agreement to treat his failure to return as a "voluntary quit." Paragraph 94(b) of the agreement provides: "Any employee who fails to report for work within three working days after the date of expiration of the [sick] leave, shall be considered as having voluntarily quit unless the employee gives a satisfactory reason." Mr. Jones asked two successive union representatives to grieve that decision, claiming he was medically unable to work, but refused to provide either one of them with medical proof that he was unable to return. Based on his refusal and their lack of any other evidence, they refused to file the requested grievances. Mr. Jones then filed this action October 21, 2004.

There is confusion in the record as to what the actual date of termination is because some documentation suggests dates later than June, 2004. This difference is not material. Local 798's evidence shows that two successive union representatives who would have been in a position to file a grievance for Mr. Jones asked him for medical documentation and he refused to provide it. Mr. Jones has not responded to that evidence with any admissible evidence of his own. Most importantly, he has not offered any proof beyond his own unsworn assertion that his own doctors continued to certify that he was unable to work at any time after May, 2004. He admits that he failed to appear for several independent medical examinations that GM requested during this time period, but claims it is because they would not reschedule them to meet his personal convenience. What he does not mention in his motion papers but what is shown by his deposition is that he had moved to Florida during this time and, according to the Complaint, enrolled in flight school. How can it be that he was well enough to pass the F.A.A. flight medicine test but was physically unable to return to work at GM and can produce no medical evidence regarding this assertion? Under ¶ 94(b), he is required to come forward with proof that he had a good reason for not returning to work. His theory seems to be that working at GM made him sick, that he was well enough to fly aircraft

17

when he was not in the plant, that any return to the plant would make him sick again (he admitted in his deposition that he could not return today), and that he is entitled to be on sick leave from GM indefinitely.  GM management was within its rights under the contract that he provide medical evidence to support his claim and he failed to do so, both then and now.

Mr. Jones has not produced sufficient proof from which a jury could find that GM breached the contract by treating him as having quit or that Local 798 failed to fairly represent him in that matter.

**6.     Plaintiff is Unable to Sustain a Claim for Discrimination or Retaliation under Title VII.**

The essential factual inquiry in a case of alleged employment discrimination under Title VII is "whether the defendant intentionally discriminated against the plaintiff."  *United States Postal Service Board of Governors v. Likens*, 460 U. S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Texas Department of Community Affairs v. Burdine*, 450 U. S. 248, 253, 101 S. Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

In a "disparate treatment" employment discrimination case, proof of discriminatory motive is an essential element of the plaintiff's proof.  *International Brotherhood of Teamsters v. United States,* 431 U. S. 324, 335 n. 15, 97 S. Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). The plaintiff thus must prove (1) differences in treatment, and (2) a discriminatory motive on the part of the employer. *Beaven v. Commonwealth of Kentucky*, 783 F.2d 672 (6th Cir.1986).

The general rules governing the order and allocation of proof in an individual, non-class action alleging that an employment decision was discriminatory are set forth in *McDonnell Douglas Corp. v. Green,* 411 U. S. 792, 800-02, 93 S. Ct. 1817, 1823-24, 36 L.Ed.2d 668 (1973).

The *McDonnell Douglas* analytical framework is to be used in a disparate treatment case. *Galbraith v. Northern Telecom, Inc.*, 944 F.2d 275, 279 (6th Cir.1991). To establish a prima facie case of disparate treatment, a plaintiff is required to show 1) that he or she is  a member of a protected class, 2) that a similarly situated non-protected persons received dissimilar (better) treatment, and 3) that sufficient evidence exists from which the Court can find a causal connection between race or sex and the dissimilar treatment. *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1270 (6th Cir.1986).

Admitting direct evidence of racial animus can be reversible error if the comments were not made by the disciplining supervisors or are remote in time.  *Smith v. Leggett Wire Co.,* 220 F. 3d 752 (6th Cir. 2000).  Comments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination.  *Carter v. University of Toledo*, 349 F. 3d 269 (6th Cir. 2003), citing *Hopson v. DaimlerChrysler Corp.*, 306 F. 3d 427, 433 (6th Cir. 2002).

Where a plaintiff alleges disparate treatment, courts " 'require indirect evidence from which an inference of discriminatory motive may be drawn, namely comparative evidence demonstrating that the treatment of plaintiff differs from that accorded to otherwise "similarly situated" individuals who are not within the plaintiffs protected group'." *Shah v. General Electric Co*., 816 F.2d 264, 268 (6th Cir.1987) (quoting B. Schlei & P. Grossman, EMPLOYMENT DISCRIMINATION LAW, at 1291 (2d ed. 1983). It is the plaintiff's burden to establish a similarity between his or her conduct and the conduct of other employees outside his or her protected class who she claims were treated differently. *Beaven*, 783  F.2d at 625-76.

Where a plaintiff alleges that employees outside of her protected class were treated differently, the difference in treatment is probative of discrimination only if the employees were so similarly situated to the plaintiff that the most likely reason for treating the plaintiff differently was

her race or sex. *See, Furnco Construction Co. v. Waters*, 438 U. S. 567, 577, 98 S. Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). If nondiscriminatory explanations will account for the differences in treatment as readily as, for example, a plaintiff's race or sex, she has not shown that the most probable explanation is her race or sex. *See, Texas Dept. of Community Affairs,* 450 U.S at 258, 101 S. Ct. at 1096 ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.")

> Employees are not 'similarly situated' merely because their conduct might be analogized. Rather, in order to be similarly situated, other employees must have been subjected to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline of it.

*Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531 (S.D.N.Y.1986), *affd without op.,* 814 F.2d 653 (2d Cir.1987), cited approvingly in *Mitchell v. Toledo Hospital,* 964 F. 2d 577 (6th Cir. 1992). For example, a different supervisor can suggest a basis other than sex or race for the difference in treatment received by two employees. *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1271 (6th Cir.1986). *See also, Jones v. Gerwens,* 874 F.2d 1534, 1541 (11th Cir.1989); *Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 606 (8th Cir.1983), (different disciplinary measures distinguished because different supervisory personnel were involved); *Thomas v. Florida Power & Light Co.*, 532 So.2d 1060, 1988 WL 142151 (S.D.Fla.1988) (plaintiff not similarly situated to comparative employee because they had different supervisors and worked at different facilities); *Lynch. v. Dean*, 1985 WL 56683 (M.D.Tenn.1985), *rev'd on other grounds,* 817 F. 2d 380 (6thCir.1987) (proof that plaintiff was disciplined more severely than workers under supervision of another foreman did not aid plaintiff in showing she was victim of discrimination); *Talley v. U. S. Postal Service*, 33 FEP Cases 233, 238 (E.D.Mo.1982), *aff'd*, 720 F.2d 505 (8th Cir.1983) (none of employees worked for plaintiff's supervisor, whose motivation was at issue; therefore, employees to whom plaintiff

compared herself were not similarly situated); *Williams v TWA, Inc,* 507 F.Supp. 293 (W.D.Mo.1980), *aff'd in part rev'd in part*, 660 F.2d 1267 (8th Cir.1981) (evidence of disparate treatment of little probative value where disciplinary measures were imposed by different supervisors at different domiciles).

Title VII was not intended to "diminish traditional management prerogatives." *Steelworkers v Weber,* 443 U. S. 193, 207, 99 S. Ct. 2721, 2729, 61 L.Ed.2d 480 (1979); *Wrenn v. Gould,* 808-F.2d 493, 502 (6th Cir.1987). It does not require the employer to restructure its employment practices to maximize the number of minorities and women hired or retained. *Furnco Construction Corp.*, 438 U.S 567, 577-78, 98 S. Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), *cited in Texas Dept. of Community Affairs*, 450 U.S at 259, 101 S. Ct. at 2096. Federal courts are not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies or private employers, *Bishop v. Wood*, 426 U.S 341, 349, 96 Sect. 2074, 2079, 96 S. Ct. 2074 48 L.Ed.2d 684 (1976), and federal statutes prohibiting discrimination are not "intended as the vehicle for general judicial review of business decisions." *Douglas v. Anderson*, 656 F.2d 528 (9th Cir.1981).

Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. "Title VII addresses discrimination." *Ferguson v. Veterans Administration*, 723 F.2d 871 (11th Cir. 1984). "Title VII is not a shield against harsh treatment at the workplace." *Jackson v. City of Killeen*, 654 F.2d 1181, 1186 (5th Cir.1981) [disapproved on other grounds by *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S. Ct. 1781, 72 L. Ed. 2d 66 (1982)].

The issue in a discrimination case is not whether the basis on which the employer acted in taking a personnel action is "sound"; rather, the issue is whether the reasons articulated by the employer are a pretext for discrimination. *In re Lewis*, 845 F.2d 624, 633 (6th Cir.1988) (emphasis

in original). *See also, Nix v. WLCY Radio*, 738 F.2d 1181, 1187, *reh'g denied (en banc),* 747 F.2d 710 (11th Cir.1984) ("Title VII does not require the employer to have good cause for its decisions. An employer may [refuse to promote a person] for a good reason, a bad reason, a reason based on erroneous facts or for no reason at all, as long as its action is not for a discriminatory reason.").

A retaliation claim is analogous to an intentional discrimination or disparate treatment case and is subject to the same sequence and burden of proof. *Virts v. Consolidated Freightways Corp. of Delaware*, 285 F.3d 508, 521 (6th Cir. 2002); *Zanders v. National R. R. Passenger Corp.,* 898 F. 2d 1127, 1134 (6th Cir. 1990). Plaintiff must first establish a prima facie case by a preponderance of the evidence. The elements of a prima facie retaliation claim are:

> (1) that plaintiff engaged in an activity protected by Title VII;
>
> (2) that the exercise of [plaintiff's] civil rights was known to the defendant;
>
> (3) that, thereafter, the defendant took an employment action adverse to the plaintiff, or the plaintiff was subjected to severe and pervasive retaliatory harassment by a supervisor; and
>
> (4) that there was a causal connection between the protected activity and the adverse employment action or harassment
> .

*Morris v. Oldham County Fiscal Court,* 201 F. 3d 784 (6th Cir. 2000), explicitly modifying, by adding the harassment language, the prior standard in *Christopher v. Stouder Memorial Hospital,* 936 F.2d 870 (6th Cir. 1991), *citing, Wrenn v. Gould,* 808 F. 2d 493, 500 (6th Cir. 1987), *Canitia v. Yellow Freight System, Inc.*, 903 F. 2d 1064, 1066 (6th Cir. 1990); *Zanders v. National Railroad Passenger Corp.,* 898 F. 2d 1127, 1135 (6th Cir. 1990); *Cooper v. City of North Olmsted*, 795 F. 2d 1265 (6th Cir. 1986); *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F. 2d 370, 375 (6th Cir. 1984).

The fact that an adverse employment action occurs after protected activity is never enough, standing alone, to prove causation. *Shoemaker-Stephan v. Montgomery Cty. Bd. of Commissioners*,

262 F. Supp. 2d 866, 885-86 (S.D. Ohio, 2003)(Rice, C.J.), *citing Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363-64 (6th Cir. 2001); *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000); *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986).

In his statement of facts supporting his claim of discrimination, Mr. Jones adverts to a situation where he and Lonnie Campbell received what he believes is disparate discipline for the same infraction of work rules (Response in Opposition, Doc. No. 69 at 34). The facts about that incident as revealed by the evidence are that on October 23, 2001, Mr. Jones and another worker left work early. Exh. 17 to Jones Dep. Both employees were disciplined for this infraction. Jones Dep. 88:19-25. Mr. Jones was suspended for two weeks and disqualified from working in Ms. Lum's department. Exh. 17 to Jones Dep. Mr. Jones admitted at his deposition that he does not know but believes that Mr. Campbell received a balance of shift plus three day suspension. Jones Dep. 89:1-16. In accordance with GM's progressive discipline, an employee's work record is a factor in assessing the discipline that is appropriate for that employee. Two employees committing the same infraction on the same day would not necessarily receive the same discipline if one had a work record significantly different from the other. Krey Decl. ¶ 7. Mr. Jones also admitted he does not know anything about Mr. Campbell's work record. Jones Dep. 89:1-16.

In his motion papers, Mr. Jones asserts that Mr. Campbell's work record up to that point is irrelevant and that what counts is whether the discipline was justified or not (Response in Opposition, Doc. No. 69, at 34). However, the case law cited above shows that in a plant where there is a progressive discipline policy, the work records of the persons being disciplined are relevant. It is not for the courts to say whether a particular amount of discipline is justified or not; inferentially, Mr. Jones admits some discipline was justified because he does not deny leaving work early. Rather, the courts are concerned with whether discipline is applied on a racially discriminatory basis. As to that question, Mr. Jones has not produced proof that he and Mr.

23

Campbell were similarly situated.

Mr. Jones also complains of a situation in which he was the victim of a racial slur by Jeff Siebert. *Id.* The context in which this allegedly occurred is as follows: On or about December, 2000, Mr. Jones was working on the Care line. Jones Dep. 242: 2-14. Mr. Jones wrote post-it notes about his supervisor, Jeff Adams. The notes said "Jeff Adams is trying to kill me. Keeps giving me this Shao Lin Tae Kwon Do look which seems to suggest I'm going to kill you." The notes went on in this vein, claiming that Mr. Adams was "stalking" him, noting "So far my arm pit odor has kept him at bay But I'm not sure how long I can hold out . . ." Exh. 13 to Jones deposition. Mr. Jones saw the notes as an attempt to get Mr. Adams to lighten up, but the Company saw this as somewhat threatening to Mr. Adams and somewhat accusatory toward Mr. Adams, in both cases improperly so. Jones Dep. 62:11-17. Mr. Jones was given a suspension and was asked to see Employee Assistance for evaluation. Jones Dep. 64: 9-65:1.

Mr. Jones began keeping notes in a journal at this time. Jones Dep. 9:5-7. He recorded every incident at work that he thought was unfair. Jones Dep. 9:11-13. He went to see Mr. Adams' boss, Jeff Siebert, on or about December 15, 2000. Mr. Siebert told Mr. Jones he agreed with Jeff Adams that the notes had been inappropriate. Exh. 41 to Jones Dep. Mr. Jones states that, during this discussion, he saw Mr. Siebert mouth the words "Dumb nigger" to himself when he thought Mr. Jones was not looking. Exh. 41 to Jones Dep. A day or so later, in December, 2000, Mr. Jones was at his workstation when he claims he heard Mr. Siebert talking to Mr. Adams about 25-30 feet away. According to Mr. Jones, Mr. Siebert told Mr. Adams "fire his ass, you fire that nigger's ass." Jones Dep. 39:15-44:21. Jones Dep. 47:11-48:1.

Mr. Jones allegedly complained to the Union that Mr. Siebert and Mr. Adams were discriminating against him. Jones Dep. 48:16-18. Although there were many other employees in the same work area where Mr. Siebert allegedly used a racial slur, Mr. Jones states he did not ask

anyone if they had heard the remark. Jones Dep. 237:2-239:10. When he allegedly complained to the Union, Mr. Jones did not provide the Union with the names of potentially corroborating witness. Jones Dep. 49:20-50:21; 238-14-239:2. The next day, December 20, 2000, the Union allegedly went with Mr. Jones to the Company with Mr. Jones' complaint. Again, according to Mr. Jones, neither Mr. Jones nor the Union identified any witnesses to this supposed remark. Jones Dep. 238:24-239:6. GM investigates any complaint of discrimination and makes a record of its investigation, even where it concludes that the accusation is not accurate. Declaration of Dan Krey in Support of General Motors' Motion for Summary Judgment ("Krey Dec.") ¶ 8. GM has no record of any such complaint by Mr. Jones. Krey Dec. ¶ 8. According to Mr. Jones, the same day as he allegedly complained of discrimination by Mr. Siebert, a Quality Manager approached Mr. Jones with an offer of transfer to C crew. Jones Dep. 233:5-19. Mr. Jones declined this offer. Jones Dep. 233:18-19.

Accepting Mr. Jones' statements as true[1], for purposes of these Motions, the alleged racial slurs which Mr. Jones attributes to Jeff Siebert would provide evidence of discriminatory animus by Mr. Siebert, but there is no evidence that Mr. Siebert's alleged animus played any part in any decision adversely affecting Mr. Jones. Instead, the record shows that, as soon as Mr. Jones complained about Mr. Siebert, he was immediately transferred away from him to Mr. Foreman and soon thereafter to Ms. McCauley. Thus the evidence is insufficient to show that GM subjected Mr. Jones to a racially hostile work place: it transferred him as soon as he raised the issue of racial slurs.

To prevail on a claim of retaliation, a plaintiff must show that he suffered an adverse employment action after, and as a result of, taking protected action under the Civil Rights Act. To be actionable under Title VII, an adverse employment action must be material. That is, it must result in a material adverse change in the terms of employment. *White v. Burlington Northern & Santa*

---

[1]The Court notes that the only sworn testimony as to these statements is taken from Mr. Jones' deposition; he has provided no sworn evidence in his opposition to these Motions.

*Fe Ry. Co.*, 364 F. 3d 789 (6th Cir. 2004)(en banc), *reaffirming Kocsis v. Multi-Care Management, Inc.*, 97 F. 3d 876, 885 (6th Cir. 1996). For example, reassignments without salary or work hour changes are not material adverse actions. *Kocsis, citing Yates v. Avco Corp.*, 819 F. 2d 630, 638 (6th Cir. 1987). The Court may grant summary judgment on the issue of causation when warranted. *Bailey v. Floyd County Bd. or Education.,* 106 F.3d 135, 145 (6th Cir, 1997). For example, reliance solely on the fact that an adverse employment decision occurred after the alleged protected conduct is insufficient. *Id.* at 144-45. "A mere scintilla of evidence is [likewise] insufficient" to create a genuine issue of material fact. *Landham v. Lewis Galoob Toys, Inc.,* 277 F.3d 619, 622 (6th Cir. 2000).

With respect to retaliation, plaintiff believes that, after he spoke to Jeff Siebert in January, 2001, complaining about Jeff Adams, GM set out on a course of retaliation against him which lasted until he went out on leave in June, 2003. In this 2 ½ year period, his longest assignment, January-September, 2002, was under Carolyn McCann, a supervisor who he admits was fair to him. His second longest assignment, from March 2001-August, 2001 was under Myra McCauley, about whom he had no complaints except that she disciplined him for loading the wrong control arms on the line, an infraction he admits he did commit. Jones Dep. 85:21-86:6. Discipline for that admitted infraction many months after the protected conduct by a supervisor Plaintiff admits was fair cannot properly be attributed to retaliation.

By contrast, the supervisors he overtly complained about were Jeff Siebert, Brian Foreman and John Bowles. He also perceived the Trim Group 5 job in which he was placed in late 2001 to be so difficult that he went on stress leave after a few days. GM's responses to his dissatisfaction in each case do not show an intent to force Mr. Jones into assignments he had trouble with. After he supposedly complained about Jeff Siebert, he was offered a new assignment the same day—which he refused--and transferred to Brian Foreman within a few weeks. He only worked for

Mr. Foreman for about three weeks. After he insisted Mr. Foreman singled him out for discipline and then went on a month's sick leave, he was transferred to Myra McCauley, an assignment that lasted five months, until he admittedly put the wrong control arms on the line. When he found the Trim Group 5 job stressful and went on stress leave, he was put in the door seal trim job under Carolyn McCann, who he admitted was a fair supervisor, for nine months.

After he complained about working under John Bowles, Mr. Jones was reassigned to Crystal Brown, but he almost immediately ran his forklift into a stack of shocks. He was then transferred to work the headliner job, which he described as "a really really good job, a very nice job." Jones Dep. 284:18-285:10. In this job, he worked under Suzette Hamilton who, he admits, treated him fairly. This was the last job he worked. He ran his forklift into the worktable in late June, 2003 and went out on leave without working another job.

This undisputed record does not support plaintiff's claim that, after he complained to Jeff Siebert, GM began forcing Mr. Jones to work in jobs he was not suited for or under supervisors who he perceived as antagonistic to him. It shows that, rather than forcing Mr. Jones into jobs he did not like, for whatever reason, GM readily removed him from those jobs and that, when he got to jobs he was comfortable in, GM kept him in those jobs for extended periods. Moreover, the record does not show Mr. Jones' job assignments becoming harsher or more unfavorable as time went on. The last job he was assigned to, after his first forklift accident was, in his works, "a really, really good job, a very nice job" under a supervisor who was fair to him. The evidence, even construed most favorably to Mr. Jones, does not support a prima facie case of retaliation.

## Conclusion

On the instant Motions, Plaintiff has submitted no admissible evidence. The evidence submitted by the Defendants, most of it admissions made by Mr. Jones at his deposition, shows that

27

there is no genuine issue of material fact and Local 798 and GM are entitled to judgment as a matter

of law. All remaining claims against these two Defendants should be dismissed with prejudice.

April 14, 2006.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).